KEKER, VAN NEST & PETERS LLP
ROBERT A. VAN NEST - # 84065
rvannest@keker.com
DAVID SILBERT - # 173128
dsilbert@keker.com
LEO L. LAM - # 181861
llam@keker.com
AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:   415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendant
IVANTIS, INC.

ARNOLD & PORTER KAYE
SCHOLER LLP
John Ulin - # 165524
john.ulin@arnoldporter.com
777 South Figueroa St, 44th Floor
Los Angeles, CA 90017-5844
Telephone:   1.213.243.4228
Facsimile:    1.213.243.4199

ARNOLD & PORTER KAYE
SCHOLER LLP
John Nilsson (*admitted pro hac vice*)
john.nilsson@arnoldporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Telephone:   1.202.942.5000
Facsimile:    1.202.942.5999

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION-SANTA ANA

GLAUKOS CORPORATION, a
Delaware Corporation,

Plaintiff,

v.

IVANTIS, INC., a Delaware
Corporation,

Defendant.

Case No. 8:18-cv-00620-JVS-JDE

**IVANTIS, INC.'S MEMORANDUM
IN OPPOSITION TO GLAUKOS
CORPORATION'S MOTION FOR
SUMMARY JUDGMENT OF NON-
INFRINGEMENT (BERLIN
PATENTS)**

Date: December 10, 2018
Time: 1:30 p.m.
Courtroom: 10C
Judge: Hon. James V. Selna

Date Filed:   April 14, 2018
Trial Date:   February 4, 2020

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................... 1

II.     BACKGROUND ...................................................................................... 3

        A.      Procedural Background ................................................................ 3

        B.      The Human Eye and Schlemm's Canal ....................................... 5

        C.      The Accused iStent Inject ........................................................... 7

III.    LEGAL STANDARD ............................................................................ 10

IV.     ARGUMENT ......................................................................................... 11

        A.      The Court should defer Glaukos's motion until after
                appropriate discovery ................................................................ 11

        B.      The Court should also defer Glaukos's motion until after
                claim construction ..................................................................... 12

                1.      The Court must construe the claims before analyzing
                        infringement ................................................................... 13

                2.      Glaukos's implicit interpretations of the claims are
                        erroneous—demonstrating why proper claim
                        construction is necessary ............................................... 14

                        a.      The asserted claims of the '659 patent do not
                                prohibit any and all contact between the
                                implant and the outer wall ................................... 15

                        b.      The asserted claims of the '741 patent do not
                                prohibit any and all contact between the
                                implant and the outer wall ................................... 17

                        c.      The asserted claims of the '357 patent do not
                                prohibit any and all contact between the
                                implant and the outer wall. .................................. 18

                3.      Dr. Berlin did not disclaim stents like the iStent Inject
                        in the prosecution of any of the asserted patents ............ 18

                        a.      Dr. Berlin did not disclaim stents like the Inject
                                during prosecution of the '659 patent ................. 18

                        b.      Dr. Berlin did not disclaim stents like the Inject
                                during prosecution of the '751 or '357 patents ..... 20

        C.      Numerous material factual disputes preclude summary
                judgment ..................................................................................... 21

                1.      The width of Schlemm's canal is disputed .................... 21

2.    The parties dispute whether the Inject is designed to "press against the outer wall of Schlemm's canal" or to minimize contact with the outer wall .................................. 22

3.    The parties dispute whether and how fluid dynamics affect the Inject's function and relationship to the outer wall ...................................................................... 23

4.    Glaukos misrepresents relevant literature and fails to establish how the Inject works in a living patient ................... 24

5.    Ivantis's so-called "admissions of non-infringement" are anything but ........................................................ 24

V.    CONCLUSION ........................................................... 25

1310824.v4

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.,*
  566 F.3d 1282 (Fed. Cir. 2009) ........................................................................12

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.,*
  346 F.3d 1075 (Fed. Cir. 2003) ........................................................................20

*ATD Corp. v. Lydall, Inc.,*
  159 F.3d 534 (Fed. Cir. 1998) ..........................................................................10

*Baron Servs. v. Media Weather Innovations LLC,*
  717 F.3d 907 (Fed. Cir. 2013) ..........................................................................11

*Biogen, Inc. v. Berlex Labs., Inc.,*
  318 F.3d 1132 (Fed. Cir. 2003) ........................................................................20

*Cole v. Kimberly-Clark Corp.,*
  102 F.3d 524 (Fed. Cir. 1996) ..........................................................................10

*Cordis Corp. v. Boston Scientific Corp.,*
  561 F.3d 1319 (Fed. Cir. 2009) ..................................................................19, 20

*Grober v. Mako Prods., Inc.,*
  686 F.3d 1335 (Fed. Cir. 2012) ........................................................................19

*HTC Corp. v. IPCom GmbH,*
  667 F.3d 1270 (Fed. Cir. 2012) ........................................................................16

*Interactive Gift Express, Inc. v. Compuserve, Inc.,*
  256 F.3d 1323 (Fed. Cir. 2001) ........................................................................16

*Invitrogen Corp. v. Clontech Labs., Inc.,*
  429 F.3d 1052 (Fed. Cir. 2005) ........................................................................20

*Kreative Power, LLC v. Monoprice, Inc.,*
  2015 U.S. Dist. LEXIS 26489 (N.D. Cal. Mar. 3, 2015) ................................14

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,*
  420 F.3d 1369 (Fed. Cir. 2005) ........................................................................11

iii

*MShift, Inc. v. Digital Insight Corp.*,
  747 F. Supp. 2d 1147 (N.D. Cal. 2010) .......................................................... 12

*Netcraft Corp. v. eBay*,
  549 F.3d 1394 (Fed. Cir. 2008) .................................................................... 16

*Novartis Pharms. Corp. v. Abbott Labs.*,
  375 F.3d 1328 (Fed. Cir. 2004) .................................................................... 13

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .................................................................... 15

*Rivera v. Remington Designs, LLC*,
  2017 U.S. Dist. LEXIS 181593 (C.D. Cal. July 7, 2017) ................................. 13

*Salazar v. Procter & Gamble Co.*,
  414 F.3d 1342 (Fed. Cir. 2005) .................................................................... 20

*Seismic Structural Design Assocs. v. Gensler*,
  2013 U.S. Dist. LEXIS 197234 (C.D. Cal. Jan. 17, 2013)............... 11, 14, 15, 16

*Spansion, Inc. v. ITC*,
  629 F.3d 1331 (Fed. Cir. 2010) .................................................................... 21

*Technology Props. Ltd. v. Huawei Technologies Co.*,
  849 F.3d 1349 (Fed. Cir. 2017) .................................................................... 19

*Trading Techs. Int'l v. ESpeed, Inc.*,
  595 F.3d 1340 (Fed. Cir. 2010) .................................................................... 16

*United States v. Diebold, Inc.*,
  369 U.S. 654 (1962) .................................................................................... 11

*Universal Elecs. Inc. v. Logitech, Inc.*,
  2012 WL 12951771 (C.D. Cal. May 9, 2012).................................. 10, 11, 13, 14

*Ventana Med. Sys. V. Biogenex Labs., Inc.*,
  473 F.3d 1173 (Fed. Cir. 2006) .................................................................... 20

**Other Authorities**

American Heritage College Dictionary, Third Ed. (1993).................................... 17

New Oxford Dictionary of English (1998)........................................................ 15

Fed. R. Civ. P. Rule 26(f) ........................................................................... 12

Fed. R. Civ. P. Rule 56(d) ...........................................................3, 4, 11, 12

Local Rules 3-2 and 3-4................................................................................. 5

Defendant and Counter-Plaintiff Ivantis, Inc. ("Ivantis") submits the following Memorandum in Opposition to the Motion for Summary Judgment filed by Plaintiff and Counter-Defendant Glaukos Corporation ("Glaukos").

## I.  INTRODUCTION

Before claim construction, before producing its relevant documents, before Ivantis has had the opportunity to take any depositions, and before any expert disclosures, Glaukos has moved for summary judgment of non-infringement of all three patents asserted by Ivantis ("the Berlin patents"). Glaukos's motion is extremely premature, and the Court should consider it only after it construes the key claim terms and Ivantis has a fair opportunity to discover relevant evidence. But even if the Court looks only to the minimal record now available—with effectively no discovery from Glaukos—there is ample basis to deny the motion, because Glaukos has dramatically oversimplified and mischaracterized the relevant anatomy, misconstrued the Berlin patent claims, and disregarded its own public statements that contradict the factual assertions in its motion.

Ivantis demonstrates the following points in this Opposition, each of which is an independent basis to deny Glaukos's motion:

*First,* Glaukos has deprived Ivantis of the discovery it needs to respond to this motion. Although Glaukos has insisted on filing a surprise, expedited summary-judgment motion, it has refused Ivantis's requests to expedite its document production accordingly and to allow Ivantis to take relevant depositions before responding. As a result, neither Ivantis nor the Court knows what Glaukos's documents and witnesses will say about the factual questions its motion raises. Summary judgment under these circumstances is improper.

*Second,* the Court must construe the claims based on a full record and briefing before it can analyze infringement. Glaukos invites the Court to decide infringement "without engaging in full-scale claim construction" (Mot. at 9), which is improper. Moreover, to the extent that Glaukos even engages with the

Berlin patents' claim language, it misconstrues it. Glaukos's motion assumes that the Berlin claims require that a device have no contact with the outer wall of Schlemm's canal. But the claims recite a device that avoids "impinging" the outer wall. The plain meaning of "impinge" is not "contact"—it is "have a negative effect on," such as, in this case, inflaming or scarring. Glaukos's motion does not even address infringement under this phrase's plain meaning, nor does it specify how the Court should construe the various claim terms containing this language.

Instead, Glaukos appears to insist, without ever explicitly saying so, that the ordinary meaning of the claim language was narrowed during prosecution. But the Berlin patents' prosecution history refutes Glaukos's arguments. The prosecution history makes clear that, while prior-art stents caused damage by impinging on the outer wall of Schlemm's canal, stents with designs like the iStent Inject can overcome this limitation. Glaukos mischaracterizes that history and misrepresents Dr. Berlin's invention.  Without actually addressing what the claims require, Glaukos has failed to carry its burden.

*Third*, an ocean of disputed facts precludes summary judgment. Glaukos cherry-picks soundbites to argue that, because Schlemm's canal can be 30 microns wide, and because the head of Glaukos's iStent Inject device (which sits in the canal) is 150 microns long, the Inject must touch the outer wall, and therefore cannot infringe. Even setting aside this argument's legal shortcomings, it is rife with factual problems, including:

- The Berlin patents' prosecution history and the scientific literature establish that Schlemm's canal can be *hundreds of microns* wide, depending on intraocular pressure ("IOP") and other factors. And the presence of a stent itself can affect these dimensions—a fact that Glaukos ignores in its motion.

- Contrary to Glaukos's unsupported assertions, the iStent Inject is designed to *minimize* contact with the outer wall of Schlemm's canal

and to avoid impinging it. The flange on the tail end of the Inject anchors it to the inner wall. The head terminates in what Glaukos calls the "central outlet"—the main hole by which aqueous humor flows out of the device—which would be occluded if the head were pressed against the outer wall as Glaukos asserts. Many other design elements also aim to reduce abrasion and inflammation of the outer wall.

- Glaukos's own public statements contradict the factual assertions in its motion. Glaukos describes the iStent Inject as *not* interfering with the outer wall, and experts in its use also depict it as spaced from the outer wall. And Glaukos has explained in other contexts that fluid flowing through a stent can push the vessel's walls away from the stent. Glaukos ignores or glosses over this evidence—along with an unknown volume of additional contradictory evidence in its internal documents that Glaukos has refused to disclose.

Considering that the Court must draw all reasonable inferences in favor of Ivantis on this motion—a duty that is especially important here, where Glaukos asks the Court to find an absence of disputed facts while withholding documents and witnesses—these and other facts set forth herein provide more than sufficient grounds to deny Glaukos's motion. Accordingly, if the Court does not defer consideration of the motion as Ivantis requests in its accompanying motion under Rule 56(d), it should deny summary judgment.

## II.  BACKGROUND

### A.  Procedural Background

Glaukos filed this lawsuit on April 14, 2018, accusing Ivantis of infringing two patents that Glaukos purchased from a third party. Dkt. 1. On August 16, 2018, Ivantis answered the complaint and asserted counterclaims against Glaukos for its willful infringement of U.S. Patent Nos. 8,540,659 ("the '659 patent"), 9,603,741 ("the '741 patent"), and 9,833,357 ("the '357 patent") (collectively, "the Berlin

3

patents"). Dkt. 44. The Court held a scheduling conference on September 17, 2018, and on September 24, the parties submitted a stipulated schedule for the case, which included, *inter alia*, dates for claim construction, close of fact discovery, close of expert discovery, and filing of dispositive motions. Dkt. 50-1. Nowhere in this schedule or the discussions surrounding it did Glaukos disclose that it planned to bring an expedited summary-judgment motion, although it surely knew that Ivantis would need expedited discovery to oppose such a motion.

Although Ivantis had no knowledge of Glaukos's intentions, it has been diligent in seeking discovery. As described in more detail in Ivantis's concurrently filed Motion, in the alternative, to Deny or Defer Summary Judgment under Rule 56(d), Ivantis propounded its initial sets of interrogatories and document requests on August 22, less than a week after it filed its answer and counterclaims. Decl. of Ajay S. Krishnan ("Krishnan Decl."), ¶ 9 and Exs. 1, 2. Glaukos responded by refusing to produce most of the requested documents. *Id.* ¶ 10, Exs. 3, 4. Glaukos's interrogatory responses were also inadequate. *Id.* Since then, Ivantis has assiduously pursued discovery from Glaukos, including discovery relevant to the pending summary judgment motion. But Glaukos has stonewalled Ivantis's efforts to obtain further documents. Krishnan Decl. ¶ 16, Ex. 8.

On the afternoon of Friday, November 2, Glaukos informed Ivantis for the first time that it intended to file an early summary-judgment motion on non-infringement. *Id.* ¶ 18. The parties held a telephonic meet-and-confer the following Monday, during which Ivantis explained why Glaukos's summary judgment motion was premature—claim construction was needed, essential fact discovery had not yet occurred (and, indeed, had been obstructed by Glaukos), and expert discovery had not started. *Id.* ¶¶ 19-20, Ex. 11. Ivantis offered an accelerated schedule that would have allowed Glaukos's motion to be heard in early 2019— long before the December 2019 dispositive-motion date in the case schedule— provided that Glaukos produced its documents promptly and made key witnesses

1   available for deposition. Glaukos rejected this offer outright. *Id.*

2   On November 11, after reviewing Glaukos's motion, Ivantis served twelve

3   more requests specifically targeting documents needed to oppose the motion. *Id.* ¶¶

4   22, 30, Ex. 13. Ivantis asked Glaukos to produce these documents by noon on

5   Thursday, November 15.  *Id.* ¶ 30, Ex. 14. Glaukos responded after 5 p.m. on the

6   15th. *Id.* ¶ 31, Ex. 15. Although Glaukos purported to comply with some of the

7   discovery requests, for the most part Glaukos claimed to have already produced

8   responsive documents, when in fact it had produced only a very narrow selection

9   of responsive documents, if at all. *Id.*

10   In total, Glaukos has thus far produced only 141 documents, including file

11   histories and other documents produced pursuant to N.D. Cal. Patent Local Rules

12   3-2 and 3-4. *Id.* ¶ 23. Only a handful of these documents pertain to technical details

13   of the Inject. *Id.* There have been no depositions, no claim construction exchanges,

14   and no expert discovery whatsoever. *Id.* ¶¶ 24-25.

15   **B.     The Human Eye and Schlemm's Canal**

16   Glaukos's initial description of the basic structures of the human eye is

17   more-or-less accurate. But Glaukos's description of Schlemm's canal ("SC") (Mot.

18   at 3) is selective and misleading. Glaukos asserts that "[t]he distance between the

19   inner and outer wall . . . of Schlemm's canal is extremely small"—around 30

20   microns or less. *Id.* at 3. Glaukos's unsupported misrepresentation of this "fact" is

21   discussed in Section IV.C.1 below. As background, however, it is important to

22   clarify that the actual anatomy of Schlemm's canal is far more complex.

23   Schlemm's canal is not a static tube—it is a dynamic vessel, and its dimensions

24   vary based on many factors.

25

26

27

28

5

Schlemm's canal is a circular vessel that rings the eye where the cornea meets the sclera (the white of the eye). It collects aqueous humor that passes into it from the anterior chamber of the eye through the trabecular meshwork. It then delivers the humor to "collector channels" along the outer wall that eventually



empty into episcleral blood vessels. *See, e.g.*, Krishnan Decl. Ex. 20, pp. 251-254 (Remington & Goodwin). The stylized figure at left shows the basic structures of this system. *Id.* Ex. 21, p. 264 (Dautriche, et al.).

The inner and outer walls of Schlemm's canal are made up of different types of cells. The inner wall, made up of Schlemm's canal endothelium cells, is "the outer boundary of an elastic membrane formed by the [Trabecular Meshwork-Schlemm's canal endothelium] complex." *Id.* Ex. 22, p. 315 (Johnstone). This wall "stretch[es]" or "deform[s]," expanding and contracting in ways that increase and decrease the distance between the inner and outer walls of Schlemm's canal. *Id.* The outer wall is less elastic. *Id.* Ex. 23, p. 334 (Ethier, et al.). It is also more susceptible to scarring and inflammation. *See, e.g.*, *id.* Ex. 28 at p. 392 (Johnstone, Saheb et al.); *id.* Ex. 31, p. 408 (Hamanaka, et al.).

Several factors affect the dimensions of Schlemm's canal, including, notably, intraocular pressure ("IOP"). When IOP is high, the inner wall, at certain points, is pushed



6

towards the outer wall. When IOP is low, on the other hand, the distance between the inner and outer walls may be hundreds of microns. *See, e.g.*, *id.* Ex. 293, p. 46 (Johnstone). Thus, as shown in the pictures above, IOP fundamentally transforms the shape of the canal and the distance between the inner and outer walls.

Dr. Berlin made these facts clear during prosecution of the Berlin patents—contrary to Glaukos's elliptical and misleading characterization of the prosecution. In particular, Dr. Berlin explained that the approximate width of Schlemm's Canal varies **from "30 *to* 300 [*microns*]."** Glasser Decl. Ex. J at Fig. 8-B, p. 313 (emphasis added); *see also id.* at 19 (describing Fig. 8-B as "clearly depict[ing] the nature, geometry, and character of the [relevant] tissues"). Dr. Berlin also explained—as Glaukos itself has done in other contexts—that a stent with fluid flowing through it can expand the vessel it occupies, changing the vessel's dimensions. *See, e.g.,* Ex. K, p. 350, GKOS00008064 ("filling Schlemm's canal prevents penetrating the outer wall by providing a larger distance of about ***300 microns between the inner and outer walls***") (emphasis added).

## C.    The Accused iStent Inject

With no support, Glaukos asserts that the Inject is intended to press against the outer wall of Schlemm's canal. Mot. at 4. But as Glaukos observes, "counsel's words are not evidence." *Id.* at 15. And the evidence strongly suggests otherwise.

To begin with, the Inject Directions for Use/Package Insert (Glasser Decl. Ex. D) nowhere suggest that the Inject is intended to tent open Schlemm's canal or press against the outer wall. Instead, they explain that "when properly implanted, the iStent *inject* stent is intended *to create a bypass through the trabecular meshwork* into Schlemm's canal to improve aqueous outflow through the natural physiologic pathway." Glasser Ex. D, p. 212 (emphasis added). Glaukos's website contains similar statements. Krishnan Decl. Ex. 19 at GKOS00007847.

Consistent with its labeling, the iStent Inject's design demonstrates that it is intended to minimize contact with the outer wall of Schlemm's canal to facilitate

the flow of aqueous humor through the device. As shown in the image at left, the Inject has a wide flange or base that resides in the anterior chamber of the eye, a



narrower middle section, or thorax, that resides in the trabecular meshwork, and a wider head, tapering to a blunt point, that resides in Schlemm's canal. *See* Mot. at 11-12. The central inlet and central outlet are 80 microns wide. There are also four smaller outlets on the sides of the head, each 50 microns wide. *See id.*

The main path for aqueous humor flowing through the Inject, therefore, is from the "central inlet" in the base, straight through the device, and out the large "central outlet." *See* Glasser Decl. Ex. D at Fig. 2, p. 211; Decl. of Dr. Michael S. Berlin In Support of Ivantis's Opp'n, ¶ 11. This architecture exposes a conundrum in Glaukos's argument: if the Inject were truly "designed to press against the outer wall of Schlemm's canal," Mot. at 4, then why did Glaukos place the "central outlet" at the tip of the head, where it would be obstructed by tissue? The Inject's design demonstrates that, in fact, the head is intended to be spaced from the outer wall to allow fluid to flow freely through the main outlet.[1]

Glaukos itself has explained one mechanism for achieving this spacing. United States Patent No. 9,962,290 (Berlin Decl. Ex. A), which is assigned to Glaukos, teaches "shunts for draining aqueous humor from the anterior chamber to the uveoscleral outflow pathway"—an alternative outflow pathway to Schlemm's canal. *See id.* at Abstract, p. 1. The patent describes stents with central outlet holes

---

[1] Fluid might still be able to flow through the central outlet if the head were placed against a collector channel in the outer wall. But Glaukos does not state that the Inject must be placed against collector channels in the product's labeling. *See* Glasser Decl. Ex. D (Directions for Use) at *passim*.

(similar to those of the Inject), which "conduct fluid from the anterior chamber to the suprachoroidal space." *Id.* col. 35, lines 39-41 (p. 68). As the specification explains, when aqueous humor flows through the stent, the "***flow can push and hold the surrounding tissue away [from] the stent***, thereby preventing tissue adhesion to the shunt . . . at the location of the fluid path. The flow can also help to . . . ***hold[] the space open and enlarge[]" it.*** *Id.* col. 35, lines 52-57 (p. 68) (emphasis added). In other words, when a stent is designed like the Inject, the flow of aqueous humor through the central outlet can produce spacing between the stent and the outer wall of Schlemm's canal, and prevent the stent from impinging the outer wall. *Id.*; *see also* Berlin Decl. ¶ 12.

Unsurprisingly, therefore, people with experience using the Inject depict it as spaced from the outer wall when implanted. The frame reproduced below from an animation entitled "iStent inject Surgical Procedure Animation 2" clearly shows a separation between the head of the Inject and the outer wall of Schlemm's canal, with fluid (shown by aqua-colored arrows) flowing through the Inject. *See* Glasser Decl. Ex. A at '659 Chart, p. 19 (the aqua arrows are in the animation and show



Inner wall of Schlemm's canal

Trabecular Meshwork

Outer wall of Schlemm's canal
(not impinged)

"iStent inject Surgical Procedure Animation 2" video at 00:34 (annotated herein).

aqueous-humor flow; the blue labeling arrows and corresponding text were annotated by Ivantis counsel). The animation is on YouTube. Glaukos has not yet produced documents showing its involvement in producing, approving, or using the animation. Krishnan Decl. ¶ 31, Exs. 15, 16. But at a minimum, the image demonstrates an understanding by clinicians who use the Inject that the head is

9

1  spaced from the outer wall when implanted.



The iStent: bypassing blockage of fluid outflow

And in fact, leading clinicians who have implanted "a large number" of iStents describe and depict the Inject in just this way.  *See, e.g.*, Krishnan Decl. ¶ 49, Ex. 29, excerpted at left (leading Australian surgeon showing how the Inject lowers IOP on his web site).

9  Glaukos's marketing materials further confirm this fact. On its website,

10  Glaukos states that the Inject **"*[l]eaves natural anatomy intact*"**—a curious claim

11  if, in fact, the device is designed to press against the outer wall of the key

12  anatomical structure (Schlemm's canal) and tent it open. *See id.* ¶ 39, Ex. 19 at

13  GKOS00007848 (emphasis added). Glaukos also stresses that the Inject is

14  **"*[m]inimally traumatic to delicate eye tissue and spares conjunctival tissue*,"**

15  strongly suggesting that the Inject is designed to avoid impinging the outer wall—

16  exactly as the Berlin patents claim. *Id.* (emphasis added).

## III.   LEGAL STANDARD

18  In a patent case, a court may grant summary judgment of non-infringement

19  where, "**upon construction of the claims** and with all reasonable factual inferences

20  drawn in favor of the non-movant, it is apparent that only one conclusion as to

21  infringement could be reached by a reasonable jury." *ATD Corp. v. Lydall, Inc.*,

22  159 F.3d 534, 540 (Fed. Cir. 1998) (emphasis added). "A district court should

23  approach a motion for summary judgment on the fact issue of infringement with

24  great care." *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 528 (Fed. Cir. 1996).

25  Glaukos bears the initial burden "to demonstrate an absence of a genuine

26  issue of material fact." If, and only if, it meets this burden, Ivantis must produce

27  enough evidence to rebut its claim and create a genuine issue of material fact.

28  *Universal Elecs. Inc. v. Logitech, Inc.*, 2012 WL 12951771, at *2 (C.D. Cal. May

9, 2012) (citing *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1373 (Fed. Cir. 2005)). "If the non-moving party meets this burden, then the motion will be denied." *Id.* Further, all inferences drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## IV.   ARGUMENT

### A.   The Court should defer Glaukos's motion until after appropriate discovery.

As set forth below, Glaukos's motion fails on its merits on numerous factual and legal grounds. But as explained more fully in Ivantis's accompanying motion under Rule 56(d), the motion is also premature, and the Court should defer ruling on it until it can decide these issues on a full record. *See, e.g.*, *Seismic Structural Design Assocs. v. Gensler*, 2013 U.S. Dist. LEXIS 197234, at *31-33 (C.D. Cal. Jan. 17, 2013) (denying motion for summary judgment as "premature" where it "was filed before any discovery, let alone expert discovery[.]").

Ivantis is entitled to discovery before producing a record to oppose summary judgment. *See Baron Servs. v. Media Weather Innovations LLC*, 717 F.3d 907, 913-15 (Fed. Cir. 2013) (district court "abused its discretion by denying [plaintiff's Rule 56(d)] request . . . to delay ruling on [defendant's] summary judgment motion" in order to permit review of defendant's source code and depositions of defendant's employees). Ivantis has been demanding documents relevant to infringement for months, without success. *See* Section II.A, *supra*. To avoid any doubt, Ivantis served follow-up requests specifically targeting the subject of this motion last week, asking for production before this opposition was due. Krishnan Decl. ¶ 30, Exs. 13, 14. Glaukos, however, has insisted on a fast-tracked summary-judgment motion combined with slow-tracked (or "no-tracked") discovery.

In the rare cases where courts have approved early summary-judgment motions, the moving party had done far more to ensure that the court has an

11

adequate record on which to decide them. In *MShift, Inc. v. Digital Insight Corp.*, for example, the defendant (1) announced its intention to file an early MSJ during the Rule 26(f) conference; (2) provided the plaintiff with a "detailed outline of every argument they intended to raise" in their motion *six weeks before it was filed*; (3) offered to make any technical and 30(b)(6) witnesses available for "immediate[]" deposition; (4) responded to non-infringement contention interrogatories *two days* after they were served; and (5) *produced 186,000 pages of technical documents* responsive to plaintiff's document requests. 747 F. Supp. 2d 1147, 1163-64 (N.D. Cal. 2010) (emphasis added).

Here, in contrast, Glaukos said nothing about an early summary-judgment motion at the Rule 26(f) conference or during the parties' scheduling discussions; only served Ivantis with a copy of its brief (not including its separate statement of facts) about 7 business days before the opposition was due; and refused to produce documents and deposition witnesses before the motion was heard. As a result, neither Ivantis nor the Court knows whether Glaukos filed its early summary-judgment motion in spite of—or even *because* of—unproduced documents in its files that would clearly demonstrate that the iStent Inject is designed to avoid impinging the outer wall of Schlemm's canal, exactly as the Berlin patents claim.

Accordingly, as set forth in Ivantis's concurrently filed motion under Rule 56(d), the Court should defer consideration of Glaukos's motion.

### B.    The Court should also defer Glaukos's motion until after claim construction.

The Court should also defer ruling until after claim construction. Glaukos does not propose any constructions in its motion, urging the Court to decide infringement "without engaging in full-scale claim construction." Mot. at 9. But that would be error. *See Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("Evaluation of a summary judgment of noninfringement requires two steps: claim construction . . . and comparison of the properly construed claims to

12

the accused product[.]"). Moreover, Glaukos's implicit interpretations of the Berlin claims are glaringly incorrect—demonstrating the need for full claim construction.

### 1.   The Court must construe the claims before analyzing infringement.

It is axiomatic that courts must construe the claims before the factfinder can decide infringement. *See Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1332 (Fed. Cir. 2004). For this reason, courts generally disfavor motions for summary judgment filed before claim-construction proceedings. *See, e.g., Rivera v. Remington Designs, LLC*, 2017 U.S. Dist. LEXIS 181593, at *11 (C.D. Cal. July 7, 2017) ("Because claim construction proceedings are not complete, summary judgment is premature, and the Motions fail on this ground"). And those concerns apply especially forcefully here, where Glaukos did not even propose claim constructions in its motion, and where its implicit interpretations of the claims are erroneous on their face.[2]

*Rivera* is instructive. That case turned on whether reusable cups for brewing single servings of a beverage (designed for use in Keurig® and similar devices) constituted a "container, disposed within the brewing chamber and adapted to hold brewing material[.]" *Id.* Observing that the dispute could not be resolved without claim construction, the Court stated: "Disputes over the scope of claim terms must be resolved ***prior to the determination whether a genuine issue of fact is presented as to their application***." *Id.* (emphasis added).

Although there may be exceptions to this rule, they are rare, and they arise under different circumstances than the ones here. This case is not like *Universal Electronics, Inc. v. Logitech, Inc.* (a case that Glaukos selectively cites), for example, where in at least one instance plaintiff UEI did not argue that the accused products would infringe under defendant Logitech's proposed construction, so

---

[2] Glaukos asserts that, when the parties met-and-conferred, Ivantis was unable to identify any claim-construction issue that the motion presented. Mot. at 9. The opposite is true. Ivantis specifically stated that claim construction was a prerequisite for deciding the motion.  Krishnan Decl. ¶ 19

13

once the Court construed the contested term, it could grant summary judgment. *See* Mot. at 9; 2012 WL 12951771, at \*10; *see also Kreative Power, LLC v. Monoprice, Inc.*, 2015 U.S. Dist. LEXIS 26489, at \*8-10 (N.D. Cal. Mar. 3, 2015) (granting summary judgment of non-infringement before claim construction where defendant would not infringe even under plaintiff's proposed construction of the straightforward term "circular": "like a circle, round").

Here, on the other hand, Glaukos has not proposed constructions in its motion and urges the Court to decide infringement without construing the claims. Further, as explained below, Glaukos's implicit constructions are wrong, and the Court cannot, and should not, attempt to determine the correct constructions on an incomplete record and without full briefing. Summary judgment under these circumstances is improper. *See Seismic Structural Design Assocs.*, 2013 U.S. Dist. LEXIS 197234, at \*31 (summary judgment not appropriate where the briefs are "not focused on a defined set of claims comprised of defined claim terms" but instead "argue past each other" in asserting competing constructions).[3]

### 2.  Glaukos's implicit interpretations of the claims are erroneous—demonstrating why proper claim construction is necessary.

Without explicitly construing the claims, Glaukos reads into every asserted claim an alleged requirement that the claimed implant must avoid any and all contact with the outer wall of Schlemm's canal. But on their face, the claims require no such thing. Glaukos's distortion of the claim language demonstrates why these issues should not be addressed, let alone decided, without proper claim construction.

---

[3] Ivantis is concerned that, having glossed over claim construction in its opening brief, Glaukos will try to argue the issue on reply. If so, Ivantis requests a fair opportunity to respond—ideally as part of the full claim-construction proceedings set for hearing in April.

14

1

**a.    The asserted claims of the '659 patent do not prohibit
any and all contact between the implant and the outer
wall.**

2

3    Method claim 1 of the '659 patent contains two recited steps and reads in

4    relevant part:

5    inserting an intraocular implant … without substantially
*impinging* the outer wall of Schlemm's canal, the
6    intraocular implant having a fluid passageway
there through, a distal end and a proximal end, the
7    distal end being positioned adjacent the inner wall
of Schlemm's canal and spaced from the outer wall
8    of Schlemm's canal, and the proximal end being
positioned at the anterior chamber of the eye so as
9    to enable the fluid to flow from the anterior
chamber of the eye into Schlemm's canal; and

10

securing the intraocular implant in place so that it does
11    not ordinarily *impinge* the outer wall of
Schlemm's canal, thereby avoiding trauma to the
12    outer wall of Schlemm's canal and reducing the
likelihood of stimulating an inflammatory cascade
13    and subsequent scar tissue.

14    '659 at 18:42-58 (emphases added). Consistent with method claim 1, apparatus

15    claim 15 of the '659 patent recites among other elements:

16    a fastening member for securing the implant in place so
as not to *impinge* the outer wall of Schlemm's
17    canal, thereby avoiding trauma to the outer wall of
Schlemm's canal and reducing the likelihood of
18    stimulating an inflammatory cascade and
subsequent scar tissue.

19

*Id.* at 20:4-8 (emphasis added).

20

21    Glaukos improperly equates the claim terms "impinging" and "impinge"

22    with mere touching—but that is not what "impinge" means. The ordinary meaning

23    of "impinge" is to have a negative effect or impact on. *See, e.g.*, *impinge*, The New

24    Oxford Dictionary of English (1998) ("have an effect or impact, especially a

25    damaging or negative one . . . .") (Krishnan Decl. Ex. 17). It is axiomatic that "the

26    words of a claim are generally given their ordinary and customary meaning" in the

27    context of the claim and the patent.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-

28    13 (Fed. Cir. 2005) (internal quotation marks omitted). And as shown above, the

claim language itself correlates "impinge" with "trauma to the outer wall of

15

Schlemm's canal" and producing an "inflammatory cascade and subsequent scar tissue." *Id.* at 18:56-58 (claim 1), 20:6-8 (claim 15).

This language from the claims and the specification is far more important for construction purposes than any language in the prosecution history—which, as discussed in Section IV.B.3 below, Glaukos mischaracterizes in any event. *See, e.g., Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (claim construction "begins and ends" with the claim language itself); *Trading Techs. Int'l v. ESpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010) ("[B]ecause prosecution history represents an ongoing negotiation between the PTO and the inventor, 'it often lacks the clarity of the specification and thus is less useful for claim construction purposes.'") (quoting *Netcraft Corp. v. eBay*, 549 F.3d 1394 (Fed. Cir. 2008)); *see also HTC Corp. v. IPCom GmbH*, 667 F.3d 1270, 1276 (Fed. Cir. 2012) ("Claim language and the specification generally carry greater weight than the prosecution history.").



Glaukos also relies on the claim language "spaced from the outer wall" for its non-infringement argument, but ignores the context of this language. This language appears only in the first step of claim 1—"inserting an intraocular implant …" The context is fatal to Glaukos's argument—even if one accepted its implicit construction—because, as shown here, during insertion the Inject device is necessarily spaced from the outer wall given that the "trocar" of the insertion instrument used to implant the Inject extends through the Inject's central outlet and indeed protrudes from the top of the Inject's head. Krishnan Decl. Ex. 19 at GKOS00007850; *see also* Glasser Ex. D at Figs. 6 and 7, p. 219.

**b.     The asserted claims of the '741 patent do not prohibit any and all contact between the implant and the outer wall.**

While the '741 patent uses different language than the '659, it too does not prohibit contact between the implant and the outer wall of Schlemm's Canal. Claims 1 and 14 of the '741 both recite:

> … the distal portion configured to substantially inhibit contact with the outer wall of Schlemm's canal when the contact surface of the distal portion engages the inner wall of Schlemm's canal and self-retains the implant with the inner wall of Schlemm's canal ….

'741 at 19:20-25 (claim 1), 20:15-20 (claim 14).   Claim 29 recites:

> … the distal portion is sized and shaped to engage a wall of Schlemm's canal and wherein engagement of the wall of Schlemm's canal is limited to engagement of an inner wall of Schlemm's canal.

*Id.* at 22:5-9.   Finally, claim 33 recites:

> … a distal portion of the implant engages a wall of Schlemm's canal and wherein engagement of the wall of Schlemm's canal is limited to an inner wall of Schlemm's canal.

*Id.* at 22:33-36.   None of these claims prohibits any and all contact between the implant and the outer wall.

In claims 1 and 14, the plain meaning of "substantially inhibit" is to hinder (not to avoid at all). *See, e.g.*, *inhibit*, American Heritage College Dictionary Third Ed. (1993) (". . . b. Biol. To decrease, limit, or block the action or function of . . . .") (Krishnan Decl. Ex. 18). In claims 29 and 33, the plain meaning of "engagement" being "limited" to engagement with the inner wall is that the implant is held fixed only to the inner wall. *See, e.g.*, *id.* at *engagement* (". . . [T]he state of being engaged."); *engaged* (". . . Partly embedded in, [built into] or attached to another part, [as columns on a wall.]"). None of these terms requires that there be no contact whatsoever between the implant and the outer wall.

      **c.**      **The asserted claims of the '357 patent do not prohibit any and all contact between the implant and the outer wall.**

The claims of the '357 patent likewise do not prohibit any contact with the outer wall.  Claims 1 and 13 of the '357 recite:

> … the distal portion sized and shaped to substantially inhibit contact with collector channels on the outer wall of the Schlemm's canal when the contact surface of the distal portion engages the inner wall of the Schlemm's canal and self-retains the implant with engagement of the inner wall of the Schlemm's canal ….

'357 at 19:18-23 (claim 1), 20:16-21 (claim 13). Again, the plain meaning of "substantially inhibit" is to hinder. Moreover, the '357 claims speak to inhibiting contact specifically with the ***collector channels*** on the outer wall. Yet Glaukos has not purported to show contact with the collector channels.

It is still premature to construe the claims, and neither party has yet proposed constructions. The parties are not due to exchange proposed constructions until December 20 and the claim construction hearing is not until next April. Dkt. No. 51 at 2. But as shown above, Glaukos has ignored basic concepts that will likely be incorporated into the ultimate construction of these terms. The Court should defer this motion until after it issues its claim-construction ruling.

      **3.**      **Dr. Berlin did not disclaim stents like the iStent Inject in the prosecution of any of the asserted patents.**

Glaukos distorts the prosecution history of the '659 patent, which does not offer an independent basis for finding non-infringement of even the '659 claims, let alone the claims of the other Berlin patents. Glaukos's assertions of disclaimer amount to vague arguments on claim construction, and thus this issue is best addressed as part of the full claim-construction process. But to the extent the Court considers it now, Dr. Berlin did not disclaim "devices with distal portions of 100 microns or larger." Mot. at 22:11-12.

      **a.**      **Dr. Berlin did not disclaim stents like the Inject during prosecution of the '659 patent.**

Federal Circuit precedent is clear that, because "[the prosecution history]

18

often produces ambiguities created by ongoing negotiations between the inventor and the PTO[,] the doctrine of *prosecution disclaimer only applies to unambiguous disavowals*." *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) (emphasis added); *see also Technology Props. Ltd. v. Huawei Technologies Co.*, 849 F.3d 1349, 1357 (Fed. Cir. 2017) ("The doctrine does not apply unless the disclaimer is 'both clear and unmistakable to one of ordinary skill in the art.'") (citation omitted).

The portion of the '659 patent's prosecution history from which Glaukos selectively quotes shows anything but a "clear and unmistakable" disclaimer. It says that "the size ***or shape*** (or both) of each [prior-art] embodiment, ***taken together with the lack of any 'fastening member for securing the implant in place' means that all the implant embodiments are likely to impinge the outer wall*** of Schlemm's canal most, if not all, of the time." Glasser Ex. K at p. 656, GKOS00008370 (emphases added). In other words, "size" is not the only factor that bears on whether a device satisfies the "impinge" language of the '659 claims. The "shape" of the device also matters, including the lack of a "fastening member." *See also id.* at 657, GKOS00008371 (noting that, in the prior art, "there is no fastening member that prevents … moving axially back and forth in response to the naturally pulsating tissue such that impingement of the outer wall of Schlemm's canal is highly probable."). Thus, Dr. Berlin did not argue in *any* fashion—let alone clearly and unmistakably—that the claimed invention was limited to an implant whose distal end was less than 100 microns, or that never touched the outer wall.[4] *See Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009) ("unclear prosecution history cannot be used to limit claims").

---

[4] The history noted that Lynch's distal, outer diameter was "100 to 500 microns, preferably 300 microns." Glasser Ex. K at p. 656, GKOS00008370. A device with that diameter would be even more likely to impinge. Yet Glaukos argues that any device with a diameter of *100 microns* or more would necessarily impinge and is thus disclaimed. Again, this is a misleading oversimplification.

1    Nor do any comments by the examiner effect such a disclaimer by Dr.

2  Berlin.[5] "[A]n examiner's unilateral statement does not give rise to a clear

3  disavowal of claim scope by the applicant[.]" *Alfred E. Mann foundation v.*

4  *Cochlear Corp.*, 841 F.3d 1334, 1341 (Fed. Cir. 2016). This is so even when the

5  applicant is silent in response. *Id.*; *see also Salazar v. Procter & Gamble Co.*, 414

6  F.3d 1342, 1347 (Fed. Cir. 2005) (applicant's silence regarding Examiner's

7  statements in notice of allowance was not disavowal of claim scope). Neither of

8  the cases Glaukos cites are to the contrary because they did not turn on an

9  examiner's statement standing alone.[6]

10          **b.    Dr. Berlin did not disclaim stents like the Inject
              during prosecution of the '751 or '357 patents**

11

12      Glaukos's arguments are even more threadbare as to the '741 and '357

13  patents. Glaukos does not point to any statements by Dr. Berlin during prosecution

14  of these patents, relying only on examiner statements, which as discussed above

15  should afforded little weight compared to the claims and specification.  Moreover,

16  the applications that issued as the '741 and '357 patents used different claim

17  language than the '659 patent, so any statements made during prosecution of the

18  '659 patent do not apply. *See Ventana Med. Sys. V. Biogenex Labs., Inc.*, 473 F.3d

19  1173, 1182 (Fed. Cir. 2006) ("[T]he doctrine of prosecution disclaimer generally

20  does not apply when the claim term in the descendant patent uses different

21  language."); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed.

22  Cir. 2005) ("[T]he prosecution of one claim term in a parent application will

23

[5] Glaukos cites the examiner's statements that "[t]he implant is configured to be . .
24  . secured such that . . . the distal end is disposed adjacent the inner wall of [SC] and
    spaced from the outer wall of [SC]," and that the invention differed from prior art
25  that did "not teach or suggest an implant that is configured to contact only the inner
    wall of [SC] (*i.e.*, inhibit contact with the outer wall of [SC])." Mot. at 7-8.

26  [6] *See ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed.
    Cir. 2003) (crediting examiner's statement because applicant indicated that it
27  applied to at least some claims); *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132,
    1139 (Fed. Cir. 2003) (applicant's acceptance of examiner's scope limitation
28  carried over because later patent claims fell within "already allowable" scope).

1310824.v4

1  generally not limit different claim language in a continuation application."); *see*

2  *also Spansion, Inc. v. ITC*, 629 F.3d 1331, 1348 (Fed. Cir. 2010) (collecting cases).

3        **C.**    **Numerous material factual disputes preclude summary judgment.**

4        Even if one accepted Glaukos's implicit construction of the asserted claims,

5  numerous disputes of material fact make summary judgement impossible.

6        **1.**    **The width of Schlemm's canal is disputed.**

7        As noted above, the anatomy of Schlemm's canal is far more complex than

8  Glaukos suggests, and the distance between its inner and outer walls can be

9  hundreds of microns. Glaukos asserts that the Berlin provisional application

10  described this distance as "less than about 30 microns." Mot. at 3 (citing Ex. J at p.

11  295). But in fact, in his provisional application Dr. Berlin stated that "[d]etection

12  of penetration *of the proximal wall* of Schlemm's canal . . . , which is *less than*

13  about 30 microns *at its maximum*, can be accomplished in a number of ways . . . ."

14  Ex. J at 295 (emphasis added). In other words, Dr. Berlin was not saying that the

15  space between the walls of Schlemm's canal was less than 30 microns—he was

16  saying that the thickness of its *inner wall* was less than 30 microns.

17        Indeed, Dr. Berlin was crystal clear that the approximate width of

18  Schlemm's Canal varies from "**30** *to* **300 [microns]**," and that "filling Schlemm's

19  canal prevents penetrating the outer wall by providing a larger *distance of about*

20  *300 microns between the inner and outer walls*"). *Id.* at Fig. 8-B, p. 313

21  (emphasis added); *see also id.* at 298; Ex. K at 350, GKOS00008064. The

22  literature that he cited confirms these facts. For example, Dr. Berlin cited Murray

23  A. Johnstone, *Aqueous humor outflow system overview*, in Becker-Shaffer's

24  Diagnosis and Therapy of the Glaucomas (Eds. Stamper, Lieberman, Derake,

25  Mosby, St. Louis: 2009). Dr. Johnstone explained that the shape of Schlemm's

26  canal varies, and that "the diameter of the canal lumen is IOP dependent and the

27  space can be . . . very large at low pressures." Ex. K at GKOS00008378.

28  Moreover, as discussed below, the iStent Inject is designed to provide spacing

IVANTIS'S MEM. IN OPP'N TO GLAUKOS'S MOT. FOR SUMM. JUDGMENT OF NON-INFRINGEMENT
CASE NO. 8:18-CV-00620-JVS-JDE

1310824.v4

1   between its head and the outer wall and to avoid impinging the outer wall. Thus,

2   Glaukos's argument that the Inject's head is larger than one possible dimension of

3   Schlemm's canal cannot provide a basis for summary judgment.

4   **2.    The parties dispute whether the Inject is designed to "press against the outer wall of Schlemm's canal" or to minimize**

5   **contact with the outer wall**

6       Glaukos asserts that "[t]he Inject is designed to press against the outer wall

7   of Schlemm's canal, dilating the canal and thus further enabling flow of aqueous

8   humor." Mot. at 4. But Glaukos offers *no* support for this assertion (not even a

9   declaration from a Glaukos engineer). And the evidence available at this early

10  stage demonstrates otherwise.

11      As noted, Glaukos points to nothing in the Inject's labeling or marketing that

12  says it is designed to dilate Schlemm's canal by pressing against the outer wall. If

13  anything, its labeling and marketing say the opposite. *See* Glasser Decl. Ex. D at p.

14  212 (stating that "when properly implanted, the iStent *inject* stent is intended *to*

15  *create a bypass through the trabecular meshwork* into Schlemm's canal to improve

16  aqueous outflow through the natural physiologic pathway") (emphasis added) and

17  Krishnan Decl. Ex. 19 at p. 664, GKOS00007847 (similar statements on Glaukos

18  website).

19      Moreover, the Inject's shape and dimensions appear designed to minimize

20  any contact with the outer wall of Schlemm's canal. As shown in the image on

21  page 9 above, the wide flange resides in the anterior chamber and anchors the

22  device to the inner wall. And the "central outlet" at the tip of the head

23  demonstrates that the head is intended not to press against the tissue of the outer

24  wall, but rather to sit within the lumen of Schlemm's canal. *See* Berlin Decl. ¶ 11.

25  Thus, as shown on page 10 above, people using the iStent Inject depict it this way.

26      Other design features of the Inject also aim to eliminate any abrasion of the

27  outer wall, even if the head makes intermittent contact with it. Not only does the

28  head taper to 85 microns, but its tip is almost entirely negative space because of the

1310824.v4

device's 80-micron-wide "central outlet." *See* Glasser Ex. E (specifications); *Id.* Ex. D, IFU at Fig. 2, p. 211. Therefore, the total surface area that faces the outer wall is only ~667.6 square microns—minimizing any potential trauma to the tissue of the outer wall.[7] The Inject is also coated with Heparin to minimize potential inflammation or other negative effects from any intermittent contact with the outer wall. *See, e.g.*, Glasser Decl. Ex. E (specifications describing Heparin coating). And indeed, a Glaukos lab notebook discussing "Design Constraints / Goals / Standards" noted that "Schlemm's canal dimensions [were] estimated at 200-450 [microns] wide, smaller in height," and that "300 [microns] is max round tube diameter to provide for atraumatic intubation of canal." Krishnan Decl. ¶ 50, Ex. 30 at GKOS00003271. It is therefore unsurprising that Glaukos states on its website that the Inject *"[l]eaves natural anatomy intact"* and is *"[m]inimally traumatic to delicate eye tissue and spares conjunctival tissue." See id.* Ex. 19 at GKOS00007848.

Thus, even the limited evidence that is now available demonstrates that the Inject is designed to minimize contact with the outer wall of Schlemm's canal and avoid impinging it, precluding summary judgment.

### 3. The parties dispute whether and how fluid dynamics affect the Inject's function and relationship to the outer wall.

As detailed above, the Inject's "central outlet" is on the tip of the device, and the main fluid path is from the "central inlet" in the base through this outlet. *See* Berlin Decl. ¶ 11. Given the flexible nature of the inner wall in which the device is embedded, this flow pattern likely expands the distance between the inner and outer walls, providing spacing between the Inject's tip and the outer wall. This is not unlike the effect of turning on a garden hose—the force of the water out exerts backward pressure on the hose. *Id.* ¶ 11.

---

[7] The 85-micron top minus the 80-micron hole yields an approximate rim width of 2.5 microns.  85 microns times π yields a rim circumference of ~267 microns.  The circumference times the width yields an area of ~667.6 square microns.

This is precisely what Glaukos described in its U.S. Patent No. 9,962,290 (Berlin Decl. Ex. A), which teaches "shunts for draining aqueous humor from the anterior chamber to the uveoscleral outflow pathway" (an alternative outflow pathway to Schlemm's canal).  *See id.* at Abstract. Glaukos stated that the "***flow can push and hold the surrounding tissue away [from] the stent, thereby preventing tissue adhesion to the shunt*** . . . at the location of the fluid path," and can also "help to . . . ***hold[] open the space open and enlarge***[]" it. *Id.* col. 35, lines 52-57. The Inject, with its large central outlet, appears to work in the same manner, thereby avoiding impingement of the outer wall.

### 4. Glaukos misrepresents relevant literature and fails to establish how the Inject works in a living patient.

Glaukos barely cites scientific literature in its motion, preferring to cherry-pick from the prosecution history and grasp at supposed Ivantis "admissions" (discussed below). But the literature it does cite does not support its motion.

For example, Glaukos relies on the Bahler, et al. study, using three pictures from this paper in its motion. *See* Glasser Decl. Ex. C, p. 201-203. But this study was conducted *ex vivo* in post-mortem eyes (without glaucoma). Glaukos fails to explain why the Court should assume that any results from this study can be extrapolated generally. Moreover, to the extent they are applicable, Bahler's findings actually refute Glaukos's claims. For example, Bahler noted that "SC does not have a uniform size around the eye circumference" and that the canal was "dilated 75 [microns] on either side of the iStent inject head," *id.* at 207. If relevant at all, therefore, Bahler provides a basis for denying summary judgment, not granting it.

### 5. Ivantis's so-called "admissions of non-infringement" are anything but.

Glaukos argues that Ivantis has made two "admissions" that "confirm that Schlemm's canal in its natural state is very narrow between its inner and outer

walls." Mot. at 16-17. Neither is as Glaukos characterized it.

First, Glaukos points to Ivantis's description of "natural" Schlemm's canals in glaucoma patients who do not have a Hydrus stent. But as discussed above, Schlemm's canal is like a balloon, whose "natural state" depends on many factors. Ivantis may have used the term "natural" to describe one image of Schlemm's canal without a Hydrus—but this was one picture of one individual's canal at one point in time (an individual who likely had increased IOP, thereby narrowing the canal). Moreover, even if Ivantis had admitted that Schlemm's canal were "natural[ly]" narrow (and it has not), the Inject would still infringe the Berlin patent claims, properly construed, for the reasons discussed above.

Second, Glaukos's reliance on an Ivantis marketing graphic is misplaced—and hypocritical. Elsewhere in its motion, Glaukos criticizes Ivantis for using screen grabs from a Glaukos marketing video in Ivantis's infringement contentions because the video was posted on YouTube, was "cartoonized," and according to Glaukos did "not purport to show an actual Inject device or the anatomy of a human eye to scale." Mot at. p. 15. Yet after filing its Motion, Glaukos has admitted that it was the source of the animation (which was created by a vendor). *See* Krishnan Decl. ¶ 31, Ex. 15. And Glaukos itself relies on a "cartoonized" Ivantis illustration as an "admission" that the Inject presses against the outer wall. *Id.* at 17. It is no such thing.

In sum, even if the Court were to accept Glaukos's implicit construction of the relevant claim terms, numerous genuine disputes of fact make summary judgement impossible at this early juncture.

## V.    CONCLUSION

For the foregoing reasons, the Court should either defer ruling on Glaukos's Motion for Summary Judgement of Non-infringement until after appropriate discovery and claim construction, or deny the motion now on the merits.

1

2    Dated:  November 19, 2018         KEKER, VAN NEST & PETERS LLP

3
                                         By:  */s/ David Silbert*
4                                             Robert A. Van Nest
                                              David Silbert
5                                             Leo L. Lam
                                              Ajay S. Krishnan
6                                             Edward A. Bayley
                                              Eduardo E. Santacana
7                                             Sophie Hood
                                              Maya Karwande
8
9                                             ARNOLD & PORTER KAYE SCHOLER LLP

10                                            JOHN ULIN
                                              JOHN NILSSON (*admitted pro hac vice*)
11
12                                            Attorneys for Defendant
                                              IVANTIS, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IVANTIS'S MEM. IN OPP'N TO GLAUKOS'S MOT. FOR SUMM. JUDGMENT OF NON-INFRINGEMENT
CASE NO. 8:18-CV-00620-JVS-JDE

1310824.v4