KEKER, VAN NEST & PETERS LLP
ROBERT A. VAN NEST - # 84065
rvannest@keker.com
DAVID SILBERT - # 173128
dsilbert@keker.com
LEO L. LAM - # 181861
llam@keker.com
AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:   415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendant
IVANTIS, INC.

ARNOLD & PORTER KAYE
SCHOLER LLP
John Ulin - # 165524
john.ulin@arnoldporter.com
777 South Figueroa St, 44th Floor
Los Angeles, CA 90017-5844
Telephone:   213.243.4228
Facsimile:    213.243.4199

ARNOLD & PORTER KAYE
SCHOLER LLP
John Nilsson (*admitted pro hac vice*)
john.nilsson@arnoldporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Telephone:   202.942.5000
Facsimile:    202.942.5999

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION-SANTA ANA

| | |
|---|---|
| GLAUKOS CORPORATION, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>IVANTIS, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 8:18-cv-00620-JVS-JDE<br><br>**DECLARATION OF DR. ROBERT STAMPER, M.D. IN SUPPORT OF IVANTIS'S SUPPLEMENTAL OPPOSITION TO GLAUKOS'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT (BERLIN PATENTS)**<br><br>Date: March 11, 2019<br>Time: 1:30 p.m.<br>Courtroom: 10C<br>Judge: Hon. James V. Selna<br><br>Date Filed:   April 14, 2018<br>Trial Date:   February 4, 2020 |

## REDACTED VERSION OF

## DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1

DECLARATION OF DR. ROBERT STAMPER, M.D. IN SUPPORT OF IVANTIS'S SUPPL. OPPOSITION TO
GLAUKOS'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT (BERLIN PATENTS)
CASE NO.  8:18-CV-00620-JVS-JDE

1321389

## DECLARATION OF DR. ROBERT STAMPER, M.D.

I, Robert Stamper declare as follows:

**<u>Introduction</u>**

1.     I have been retained by Ivantis, Inc. ("Ivantis") to provide my opinions with respect to issues in *Glaukos Corp. v. Ivantis, Inc.*, Case No. 8:18-cv-00620-JVS-JDE (C.D. Cal.). I make this declaration in support of Ivantis's Supplemental Opposition to Glaukos Corporation's ("Glaukos") motion for summary judgment of non-infringement.  I have personal knowledge of the facts set forth herein, and the opinions set forth herein are my own.  If called to testify as a witness thereto, I would do so competently under oath.

2.     I am currently a Distinguished Professor of Ophthalmology at the University of California, San Francisco, located in San Francisco, CA, where I have served as a professor of ophthalmology since 1998.

3.     I hold a Bachelor of Arts Degree in Psychology from Cornell University (1961) and a Doctor of Medicine Degree from the State University of New York Downstate Medical Center (1965).  I am licensed by the State of California, a diplomate of the National Board of Medical Examiners, and am certified by the American Board of Ophthalmology.

4.     I have over 40 years of extensive experience in the diagnosis and treatment of glaucoma.  I am a past president of the American Glaucoma Society.  I have served on the Board of Directors for the Glaucoma Research Foundation since 1982, and served for two years as the vice president of the Glaucoma Research Foundation.  I am an author of multiple editions of a leading textbook in the glaucoma field.  *See* Stamper, RL, Lieberman MF, Drake MV, Becker-Shaffer's Diagnosis and Therapy of the Glaucomas, 8th Edition, Mosby/Elsevier, Inc., Philadelphia, 2009.  I have authored over 100 peer-reviewed publications on glaucoma-related

1

topics.  I have delivered lectures and symposia by invitation, nationwide and worldwide, on glaucoma-related topics.

5.      I have been performing glaucoma surgeries since the 1970s.  I have performed trabeculectomy, thermal sclerostomy (Scheie procedure), and tube-shunt surgery.  I have performed surgeries using the Ex-Press® shunt (now Alcon), and have collaborated with iScience in the development of a cannula (now sold by Ellex) for gonioscopy-assisted transluminal trabeculotomy (GATT) surgery and trabeculectomy, both *ab externo* and *ab interno*.  I have performed over 100 trabectome procedures.

6.      More recently, I have performed minimally invasive glaucoma (MIGS) procedures, including procedures using the Glaukos iStent® Trabecular Micro-Bypass Stent, the New World Medical Kahook Blade®, and the Alcon CyPass® Micro-Stent.  I served as Chairman of the Data and Safety Monitoring Committee for the pivotal U.S. study that allowed the CyPass® Micro-Stent to gain FDA approval.  Even more recently, I have performed procedures using the iStent inject® Trabecular Micro-Bypass System.

7.      A copy of my *curriculum vitae* is attached hereto as Exhibit A.

8.      I am being compensated for my work with respect to this litigation.  My compensation is not contingent in any way.  In particular, my compensation does not depend on the content of my opinions or the outcome of this case.

**Information Considered**

9.      In preparing this declaration, I reviewed U.S. Patent Nos. 8,540,659 ("the '659 Patent"), 9,603,741 ("the '741 Patent"), and 9,833,357 ("the '357 Patent") (collectively "the Berlin Patents"), which I understand Ivantis has asserted against Glaukos in this litigation.  I have also reviewed each of the additional documents cited herein.

**Technical Background**

10.     In a normal human eye, there is a constant flow of aqueous humor through the anterior portion of the eye.  Aqueous humor passes from the posterior chamber to the anterior chamber through the pupil, and then exits the eye.  The natural outflow system of the eye includes a pathway from the anterior chamber to the venous system, the pathway including the trabecular meshwork, the juxtacanalicular tissue, Schlemm's canal, and the collector channels.

11.     The trabecular meshwork consists of a stack of flattened, interconnected, perforated sheets.  The trabecular meshwork is made of fragile, delicate, expandable, and relatively flexible tissue.  The inner layers of the trabecular meshwork border the anterior chamber.  The outer layers of the trabecular meshwork are separated from Schlemm's canal by a thin strip of connective tissue called the juxtacanalicular tissue.

12.     Schlemm's canal is an endothelial-lined circular channel that runs circumferentially around the iris.  The portion of Schlemm's canal nearest the anterior chamber is referred to as the "inner wall," while the portion of Schlemm's canal nearest the sclera is referred to as the "outer wall."  The outer wall of Schlemm's canal is relatively rigid with respect to the inner wall because the outer wall is backed by the solid collagen of the sclera, while the inner wall is backed by the flexible trabecular meshwork and the fluid-filled anterior chamber.

13.     Historically, measurements of the dimensions of Schlemm's canal may not have accurately reflected those of a living human eye, with blood and aqueous humor pumping therethrough, because such measurements have been largely made on post-mortem eyes.

Generally, however, it is understood that Schlemm's canal has a slit-like lumen that ranges from 190 μm to 370 μm in diameter.[1]

14.     Aqueous humor drains from Schlemm's canal into the venous system via a series of intrascleral collector channels whose mouths are disposed on the outer wall of Schlemm's canal.  Each eye includes about 20 to 30 collector channels, irregularly spaced at intervals of about 0.3 mm to 2.8 mm.[2]

15.     Glaucoma is an eye disorder in which the natural outflow system of the eye ceases to function properly, resulting in an increase in intraocular pressure.  In some instances, if left untreated, this increase in intraocular pressure can result in impaired vision, or blindness.

16.     Several approaches have been employed to treat glaucoma.  For example, pharmaceutical treatments have been used in attempts to reduce intraocular pressure.  Laser treatments have been used in attempts to reduce the formation of fluid within the eye.

17.     Surgical approaches have also been employed to treat glaucoma.  Categories of surgical treatments have included those that enhance outflow channels, those that bypass the entire natural outflow system, and those that bypass some of the outflow system.  Some surgical treatments have involved the use of surgical implants designed to reduce intraocular pressure by providing a pathway that aids in allowing the flow of aqueous humor from the anterior chamber.

18.     Examples of implant devices for treating glaucoma are described in U.S. Patent No. 6,450,984 to Lynch, et al. ("Lynch").  As shown in the figure below, each embodiment described by Lynch includes a distal portion (25) designed to be disposed within Schlemm's canal, the distal portion composed of a tube or trough that extends inside Schlemm's canal in a

---

[1] F. Hoffmann, et al., Schlemm's Canal under the Scanning Electron Microscope, Ophthalmic Research 2:37-45, 43 (1971) (Decl. of David Silbert in support of Ivantis's Supplemental Opp'n to Glaukos's Mot. for Summ. Judgment ("Silbert Decl.") Ex. 37).
[2] Dkt. No. 54-15 at 668 (GKOS00008382).

circumferential direction with respect to the iris.[3]  In describing the embodiments, Lynch states that "The total length of the distal portion 25 may be between about 1 and 40 mm, preferably about 6 mm."[4]



19.     None of the embodiments described by Lynch are designed to be fastened to the inner wall of Schlemm's canal, so as to prevent movement of the device (100) relative to the inner wall, in an axial direction with respect to a proximal portion (10) of the device.

20.     Additional examples of implant devices for treating glaucoma are described in U.S. Patent No. 6,638,239 to Bergheim, et al. ("Bergheim") (Silbert Decl. Ex. 38).  As shown in the figure below, each embodiment described by Bergheim includes a distal section (32) designed to engage both the inner and outer walls of Schlemm's canal to retain and stabilize the device within Schlemm's canal. [5]

---

[3] *E.g.,* U.S. Patent No. 6,450,984 to Lynch, et al., Fig. 1A (Dkt. No. 54-12).
[4] *Id.*, col. 3, ll. 42-45.
[5] *E.g.,* U.S. Patent No. 6,638,239 to Bergheim, et al., Fig. 3 (Silbert Decl. Ex. 38).



**The Berlin Patents**

21.     The Berlin Patents share a single inventor, Dr. Michael S. Berlin.  As shown in the figure below, the Berlin Patents disclose an implant device (99) that extends through the trabecular meshwork (9).  The implant device includes a distal end that resides in Schlemm's canal (11), and a proximal end having a flange portion (105) that resides in the anterior chamber.[6]



22.     An advantage of the implant devices disclosed in the Berlin Patents is that they are designed to reduce contact between the device and the outer wall of Schlemm's canal, thereby minimizing trauma to endothelial cells along the outer wall.  As discussed in the Berlin Patents, "if damage occurs to the outer wall of Schlemm's canal and collector channel openings,

---

[6] U.S. Patent No. 8,540,659 to Berlin, Fig. 15.

resultant scarring prevents aqueous humor egress through the distal outflow pathways."[7]  The notion that scarring can block collector channels is one that is commonly held among practitioners in the glaucoma field.

23.    During prosecution of the '659 Patent, Dr. Berlin explained to the Patent Office that "the tissue of the outer wall of Schlemm's readily responds to trauma by producing scar tissue. . . . The outer wall of Schlemm's canal, which is continuous with the vascular collector channels, responds to trauma in a manner similar to most vascular endothial [sic] tissue with an inflammatory response and subsequent scar formation."[8]  Dr. Berlin further explained that his invention provided an advantage over previous implant devices in that his invention was designed "so as not to impinge the outer wall," enabling aqueous to flow from the anterior chamber into Schlemm's canal "without inducing the inflammatory response and the subsequent healing responses associated with trauma to the outer wall of Schlemm's canal."[9]

24.    Dr. Berlin distinguished the invention of the '659 Patent over previous implant devices, such as those described by Lynch, by explaining that implants that "impinge the outer wall" include those having a "straight distal member . . . disposed in a curved vessel chamber, thereby making it likely that the ends of member . . . will impinge the outer wall" and those having a "curved distal member" that "may not actually conform to the curvature of the inner wall, thereby forcing it against the outer wall."[10]  Dr. Berlin further explained that implants that "impinge the outer wall" include those having "no fastening member that prevents the proximal

---

[7] U.S. Patent No. 8,540,659 to Berlin, col. 3, ll. 42-45.
[8] Dkt. No. 54-15 at 592 (GKOS00008033 at GKOS00008306).
[9] *Id.*
[10] *Id.* at 657 (GKOS00008033 at GKOS00008371).

portion . . . from moving axially back and forth in response to the naturally pulsating tissue such that impingement of the outer wall is highly probable."[11]

25.     The invention of the '741 Patent was deemed different from previous implant devices, such as those described by Bergheim, that were "configured to contact all surfaces (inner and outer) of Schlemm's canal" for purposes of anchoring the device, because those devices "necessarily contact[] the inner and outer walls of Schlemm's canal."[12]  Further, the invention of the '357 Patent was deemed different from previous implant devices, such as those described by Bergheim, because those previous implant devices were not configured to prevent collector channels on the outer wall of Schlemm's canal from being blocked.[13]

**The Glaukos iStent inject® Trabecular Micro-Bypass System**

26.     The Glaukos iStent inject® Trabecular Micro-Bypass System is a system that includes intraocular stents indicated for use in conjunction with cataract surgery for the reduction of intraocular pressure (IOP) in adult patients with mild to moderate primary open-angle glaucoma.[14]  The intraocular stent of the iStent inject® Trabecular Micro-Bypass System is referred to herein as the "Inject."

27.     The Inject is a unitary structure consisting of a proximal cylindrical flange, a distal frustoconical head, *i.e.*, having the shape of a truncated cone, and a cylindrical thorax extending between the flange and the head.  During surgery, the Inject is inserted through a corneal incision in a patient's eye, advanced through the patient's anterior chamber, and placed such that the head of the Inject penetrates the patient's trabecular meshwork.  Upon implantation,

---

[11] *Id.*
[12] Dkt. No. 54-19 at 1223-24 (GKOS00008536 at GKOS00009737-38).
[13] Dkt. No. 54-20 at 1519 (GKOS00009835 at GKOS00010352).
[14] Dkt. No. 54-7 at 212 (Directions for Use / Package Insert - Glaukos Corporation iStent *inject* Trabecular Micro-Bypass System ("DFU")).

the Inject is positioned such that the head resides in Schlemm's canal, the thorax resides in the trabecular meshwork, and the flange resides in the anterior chamber.[15]



**Figure 1. iStent *inject* Stent Dimensions**

28.     Upon implantation, the distal end of the flange (the end of the flange that connects with the thorax) abuts the trabecular meshwork while the proximal end of the head (the end of the head that connects with the thorax) abuts the inner wall of Schlemm's canal.  When implanted, the trabecular meshwork surrounds the thorax of the Inject.  Thus, the design of the Inject causes it to retain itself in place, preventing movement of the Inject relative to the trabecular meshwork or the inner wall.

29.     The proximal end of the flange includes a central inlet that extends and passes straight through the structure of the Inject to a same-sized central outlet at the distal end of the head.  The Inject further includes four side outlets, evenly spaced about the frustum of the head.[16]

---

[15] DFU at 210, 216-22.
[16] DFU at 211.



**Figure 2. iStent *inject* Model GTS400 Design**

30.     According to technical drawings provided by Glaukos, ████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████.[17]

---

[17] ████████████████████████████



31.     The Directions for Use for the Inject state that "when properly implanted, the iStent *inject* stent is intended to create a bypass through the trabecular meshwork into Schlemm's canal to improve aqueous outflow through the natural physiological pathway."[18]  I understand that to mean that, although the Inject provides an artificial conduit for aqueous humor through the trabecular meshwork, the Inject is not intended to alter the natural anatomy of Schlemm's canal or otherwise distort the dimensions of Schlemm's canal.  The Inject is designed to allow for the flow of aqueous humor from the anterior chamber into Schlemm's canal, and out of Schlemm's canal via the collector channels, as is the case in a healthy eye.

---

[18] DFU at 212.

32.    I understand that Glaukos's lawyers have argued that the Inject "presses into the

outer wall, expanding the outer wall.[19] ████████████████████████████

████████████████████████████████████████████████████████

████████████████████"[20] The 150 μm length of the Inject head is such that it

can fit within the 190 μm to 370 μm diameter of Schlemm's canal without pressing into or

expanding the outer wall.

33.    Additional Glaukos documents support my understanding that the Inject is

designed so as to ████████████████████████████████



████"[22] Glaukos further explains that the Inject ████████████████████

████████████████████████████████

████████████████████████████

████████████████"[24]

34.    The Inject includes a straight fluid passageway that extends from the central inlet

to the central outlet.  The Inject also includes right-angled passageways extending from the

central inlet to each of the side outlets.  Because the passageway extending to the central outlet is

straight, and because it is significantly wider that the passageways extending to the side outlets,

---

[19] Memorandum in Support of Glaukos's Motion for Summary Judgment of Non-Infringement
(Dkt. No. 56-4) at 16.
[20] ████████████████████████████████
[21] ████████████████████████████████
[22] ████████████████████████████████
[23] ████████████████████
[24] ████████████████████

the passageway extending to the central outlet provides the path of least resistance for fluid traveling through the Inject.  Therefore, fluid traveling through the Inject is most likely to flow from the central inlet to the central outlet when the outlets are unobstructed.

35. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████ 25 ███████████████████

████████████████████████████████ 26



36. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████.27

_____

25 █████████████████████████████████
26 ████████████████████████████████████████
█████████████████████████



37.

38.

███████████████████████████████████████████ [30] ██████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████

**Opinions Regarding Claim Limitations**

<u>The '659 Patent</u>

39.     Claim 1 of the '659 Patent recites "inserting an intraocular implant . . . ___*without substantially impinging the outer wall of Schlemm's canal*___" and "securing the intraocular implant in place ___*so that it does not ordinarily impinge the outer wall of Schlemm's canal*___." Claim 15 of the '659 patent recites "a fastening member for securing the implant in place ___*so as not to impinge the outer wall of Schlemm's canal*___."  I believe that the Inject satisfies those claim limitations.

40.     I understand that Ivantis has proposed that the term "impinge" should be interpreted to mean to "damage" or to "injure."  I understand that terms of a patent claim are to be given the meaning that the terms would have to a person of ordinary skill in the art at the time of the invention in view of the specification and file history.  Upon consideration of the Berlin Patents, the education level of the inventor and active workers in the field, the sophistication of the technology, the problems encountered in the art, and the prior art solutions to those problems, I believe that a person of ordinary skill in the art would have a medical degree and at least two years of training or experience in ophthalmology, or a degree in biomedical or mechanical engineering with a background of at least two years of working experience in this area.

---

[30] ███████████████.

41.     I believe that Ivantis's proposed interpretation of "impinge" is consistent with how a person of ordinary skill in the art would have interpreted the term "impinge" in view of the specification and file history of the '659 Patent.  In particular, I believe that a person of ordinary skill in the art would have understood the term "impinge" to have a negative connotation, as in doing something beyond merely contacting, but rather doing something that caused harm.

42.     As discussed above, in distinguishing his invention over previous implant devices, Dr. Berlin explained that implants that "impinge the outer wall" include those having a "straight distal member . . . disposed in a curved vessel chamber, thereby making it likely that the ends of member . . . will impinge the outer wall" and those having a "curved distal member" that "may not actually conform to the curvature of the inner wall, thereby forcing it against the outer wall."[31]  The Inject does not have either of those types of distal members.

43.     Dr. Berlin also explained that implants that "impinge the outer wall" include those having "no fastening member that prevents the proximal portion . . . from moving axially back and forth in response to the naturally pulsating tissue such that impingement of the outer wall is highly probable."[32]  The Inject, by contrast, does have a fastening member that prevents the device from moving.[33]

44.     ████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████[34] ████████████████

---

[31] Dkt. No. 54-15 at 657 (GKOS00008033 at GKOS00008371).
[32] *Id.*
[33] DFU at 211 (describing "Flange designed to retain the device in the AC").
[34] ████████████████████████████████████████

███████ ,"[35]  Furthermore, the Inject is coated with heparin,[36] ██████████████████████

███████ [37] thereby preventing damage to the outer wall.

45.    I would disagree with interpreting the term "impinge" in the '659 Patent to mean mere "contact" (with the outer wall of Schlemm's canal).  Nonetheless, the Inject would still satisfy the above claim limitations for the reasons discussed below with respect to claims 1 and 14 of the '741 Patent, which recite "the distal portion configured to substantially inhibit contact with the outer wall of Schlemm's canal."

46.    Claim 1 of the '659 Patent recites "the distal end being positioned . . . ***spaced from the outer wall of Schlemm's canal***."  I believe that the Inject satisfies that claim limitation.

47.    



[38]

[39]

48.    Furthermore, in view of the dimensions of the Inject and the dimensions of Schlemm's canal, as well as the relatively flexible nature of the inner wall with respect to the outer wall, any fluid that exited the central outlet of the Inject would have a tendency to push the

---

[35] ████████████████████

[36] DFU at 210.

[37] 

[38] *See e.g.,* ███████████████████████████████████████████████████████████████

Inject away from the outer wall, toward the anterior chamber, causing the distal end of the Inject

to be spaced from the outer wall of Schlemm's canal.

### The '741 Patent

49.     Claims 1 and 14 of the '741 Patent recite "***the distal portion configured to***

***substantially inhibit contact with the outer wall of Schlemm's canal.***"  I believe that the Inject

satisfies that claim limitation.

50.     ████████████████████████████████████████████████████████

████████████.[40]  Aqueous humor flows from the central outlet under normal conditions in

which the outlet is unobstructed and, thus, not in contact with the outer wall of Schlemm's canal.

51.     To the extent the distal end of the Inject might come into contact with the outer

wall of Schlemm's canal during use, any such contact is significantly reduced and, thus,

substantially inhibited, due to the design of the Inject head.  More specifically, the frustoconical

shape of the Inject head ensures that the only portion of the Inject that could potentially contact

the outer wall of Schlemm's canal would be the distalmost edge of the central outlet.  Assuming,

for example, that the distalmost edge of the Inject has an outer diameter of 85 μm and an inner

diameter of 80 μm, the maximum surface area of the Inject that could potentially contact the

outer wall of Schlemm's canal would be $\left[\left(\frac{85\mu m}{2}\right)^2 - \left(\frac{80\mu m}{2}\right)^2\right] \times \pi \approx 648\mu m^2$.

52.     Claim 29 of the '741 Patent recites "***wherein engagement of the wall of***

***Schlemm's canal is limited to engagement of an inner wall of Schlemm's canal.***"  Claim 33 of

the '741 Patent recites "***wherein engagement of the wall of Schlemm's canal is limited to an***

***inner wall of Schlemm's canal.***"  I believe that the Inject satisfies those claim limitations.

---

[40] *See e.g.,* ████████████████████████████████████████████████

████████████████████████████████████████████████████

53.     As discussed above with respect to claims 1 and 14 of the '741 Patent, due to the frustoconical shape of the Inject head, any potential contact between the distal end of the Inject and the outer wall of Schlemm's canal is substantially inhibited.  Neither the distal end of the Inject, nor the outer wall of Schlemm's canal, plays a role in securing the Inject in place during use.  However, the larger proximal end of the Inject contacts the inner wall of Schlemm's canal to secure the Inject in place.

54.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████.[41]

### The '357 Patent

55.     Claims 1 and 13 of the '357 patent recite "***the distal portion sized and shaped to substantially inhibit contact with the collector channels on the outer wall of the Schlemm's canal***."  I believe that the Inject satisfies that limitation.

56.     The purpose of the Inject is to allow access to collector channels without occluding the collector channels.  It is this access that allows aqueous humor to drain out of Schlemm's canal via the collector channels, "through the natural physiological pathway."[42]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[43]

---

[41] *See e.g.,* ████████████████████████████████████████

████████████████████████████████████████

DFU at 212.
[43] ████████████████████████████████

██████████████████████████████████████████████████

█████ ."[44]

57.     Moreover, the frustoconical shape of the Inject head ensures that any potential

contact between the distal end of the Inject and the collector channels is significantly minimized,

if not completely avoided.  In view of the size of the distal end of the Inject, and the locations of

the collector channels about the outer wall of Schlemm's canal, both of which are discussed

above, the probability that the Inject will be implanted in a position where it is even capable of

contacting a collector channel is extremely low.

Executed in San Francisco, CA, this **23**ʳᵈ day of February, 2019

Dr. Robert Stamper, M.D.

---

[44] ████████████████████████████████████████

20